hi, thank you for coming. I'm Andrew Pierce, I'm here to argue on behalf of Continental Business Credit, Mr. Scott Berman. We'll be here in a moment. That's going to talk about the motion for reconsideration issue. I'm going to talk about the two other issues in the case. As I understand it, the case is relegated to whether you can recover the extra contractual damages. Is that right? That's correct, Your Honor. All right. It's a pretty substantial amount, though, between an attorney, just under the Prompt Payment Act, to be over a million dollars. So turning to that issue first, the Texas Insurance Code does provide that in addition to recovering on an insurance claim, an insured may recover 18% interest per annum, and attorney fees. We're talking about a $2 million claim here that was heavily litigated, hence we get a fairly large number. This claim was alleged as a separate claim for relief, both in Continental's affirmative lawsuit that we originally brought in California, then consolidated in Texas, and in its cross-complaint in the Gen Robb action brought against it by Tramago. The Prompt Payment Act, the remedies are available under the Cater and Higginbotham case. Don't you have to establish as a predicate for prompt payment that there was a contractual breach? Yes, we do, Your Honor. Under the Cater and Higginbotham cases, we do not have to show that there was unreasonable conduct by the insurer. We were precluded from proving liability under the policy here because summary judgment was granted. This was the case in which we were suing for a determination of coverage. Wait a minute. You already settled up the claims under the policy, didn't you? We settled and we released our claims, not under the policy, but our breach of contract claims. Well, what is that other than, what's the difference between a breach of contract claim and a claim under the policy? Because they were separately planned in this case, Your Honor. But as a theoretical matter, what's the difference? I'm not trying to cause a problem for you. I literally don't understand what... The policy carries with it not just the contractual obligation to pay the claim, but also it carries with it the statute. It also carries with it the body of case law regarding bad faith under Texas law, which is a separate thing. Breach of the covenant of good faith and fair dealing also pled as a separate claim here. These claims were explicitly preserved at the settlement stage by our saying that statutory and tort claims were preserved. And hence, there was a payment of the claim, but there was not a release of the policy as a whole. In an insurance policy release, it would be a general release, it would say all claims under this policy, all causes of action under this policy are released. There's nothing like that here. It's just simply the payment of the principal amount that was released because it was received in full. When we reserved our rights to statutory claims, this is the statutory claim. When we reserved our right to tort claims, they were the claims for breach of the covenant, fraud, and negligence, which were all separately pled as claims. There couldn't have been any mistake about that. But I mean, when the claim under the policy itself, the amount due under the policy, when that's resolved, the suit on the policy is no longer viable. I don't quite understand how you can claim the prompt payment claim penalty when there's been no liability determined of liability under the policy. That's because the court granted summary judgment without ruling out. Because that was the end of the case. It was a suit on the policy and a suit on the contract, and that was settled. Well, if liability under the policy is an element of additional claims, liability under the policy is... You settled that claim. You settled the claim that there was liability under the policy. Neither side, the other side didn't admit they breached. You took a dispute of demand and settled. So you gave up the right to claim there was breach of contract. That's true. We're not, well, we didn't give up the right to claim there was breach of contract. We gave up the right to recovery under the contract. I would just...  You can't recover under the contract. But we can recover under the statute. You can't show that you're entitled to recover under the contract, and that's a predicate before you get to the... Statute. We believe we can show we were entitled to recover under the contract. You waived that in your settlement agreement. No, we did not waive. We waived recovery under the contract. We did not waive the theoretical question of whether there's coverage or not. That was expressly not decided at that stage. The court can still determine there was coverage. You were not promptly paid. The two years went by. I'll give you an example of that. If an insurance company paid in a claim in its entirety, let's say up to the policy limits the day before trial, they would say, well, you have no claim for breach of contract. We paid your every penny. Therefore, these penalties, the attorney fees, the interest, they all go away. Well, that can't be what the Prop Payment Act provides for. Prop Payment Act is to... That's different than you saying we settle in relinquish of breach of contract claim. It's not different because in that case, it's released through payment. Here, it's released through payment in our dismissing a claim. There's nothing in the Prop Payment Act that says you have to have a breach of contract claim still unpaid at the time you collect these damages. As I understand the settlement, you released your right to prove breach of contract. We released our right to recover for breach of contract. That's how I would characterize it. I don't think the language that you just used was the language that was used in front of the court. I think we got your argument on that. All right. With respect to this motion for summary judgment, we contend that the trial court erred in granting summary judgment based on there being no evidence for the non-contractual claims when that argument was not raised until the reply. We start with the uncontroversial proposition, I hope, that a party opposing the motion for summary judgment under Rule 56 need not respond to arguments made for the first time in a reply. You don't have to go through a reply brief, scrutinize it, and determine if you're being asked to prove some new element of one of your claims or to respond to some new affirmative defense. There's no obligation to do a reply to reply under Rule 56 or to make a motion for leave to do so. It's on the moving party to bring their arguments forward in their moving papers. Nothing in the ruling suggests you have to object, although in this case we did very specifically object and did request the right to further briefing if the court was going to consider the arguments without a ruling from the court. This is a common-sense rule for any sort of orderly proceeding that you know what you're dealing with and there aren't endless rounds of briefing. Well, that's exactly what the district court was talking about. If ever there's a district judge in this country that understands that problem, it's somebody in McAllen. So in the motion, Euler says, there's no sustainable extracontractual claim is either stated nor is there evidence that would support any such claim. And they also say Continental does not have any sustainable extracontractual claims and was owed no duty outside the subject policy. But it specifically says, nor is there evidence that would support any such claim. So arguably, at least it seems to me, the ball is then in your court to say, oh, yes, there is a claim, multiple claims, and here's the evidence. But you didn't do that. Judge Hinojosa says enough. Well, what you're reading from, Your Honor, I believe is not the motion itself. It's from the points and authorities or the memorandum of law. The notice of motion itself simply says that Continental had no sustainable extracontractual claims and was owed no duty under the policy. The only portion in the memorandum of law that uses that sustainable term and explains what they mean by that is point four. And the heading, I happen to have it open to that page because I thought this might come up. The heading reads, Continental has no sustainable claims for bad faith, which is only one of the four court claims, as a result of its waiver of any contractual claim under the policy, which we just talked about a moment ago. They're not saying you don't have evidence for these claims. They're saying because you waived your contractual claim, therefore, you have no sustainable claims for bad faith. That's the only argument that was made. There's no argument about any of the other court claims being not sustainable. There's no reference to there not being evidence. Now, you say that you had a deal with the other side. An understanding, yes. Yeah. That you were going to have discovery and all kinds of stuff. This motion was set to be heard before the discovery was going to take place. There were full depositions taken after our opposition was due. Did you put in something in front of the district court that we had this deal, and these people are welching on the deal? Yes. That was put in on our objection to the reply brief, Your Honor. Well, I mean, that was pretty late in the day. Well, we couldn't make the argument until after we saw the reply brief, so I don't know how we could have made it earlier. In any event, we did not read this argument that there's no sustainable claims for bad faith as a result of waiver of contractual claims under the policy as a generic call out of every element of every cause of action, including one's ugly and bad faith. And the argument itself is a very narrow one. What they're saying is, because you have no rights under the policy, which we disagree with, but because you have no rights in the policy, you're in a narrow window of Texas law, in our case called Republic Insurance versus Stoker, where perhaps if you can show an extraordinary act, there could be bad faith even without coverage. Now, there's no determination in this case that there was no coverage. The settlement explicitly allowed both sides to argue coverage either way. So there was no finding there was no coverage. In fact, they paid the full amount of the claim. So to say there was no coverage is frivolous at that point. But in any event, the argument they're making is you can't prove one of these extraordinary acts that even in a non-covered claim situation under the Stoker case would allow you to cover something in claims handling that went beyond anything that should be countenanced. And we said, very simply, that's not our argument. Our argument is not that the claims weren't covered and that you mishandled them in some fashion. Our argument is that the claims were covered and that you were in bad faith in not paying attention to the evidence, policy, et cetera, et cetera, et cetera. Did you have any details on how they were in bad faith or how they marketed the product? No, we did not put that into our original opposition. It's all in the motion for reconsideration. Mr. Berman can speak to, and we've delegated that portion of this to him. He'll be up here in a moment. But no, we did not present the detailed arguments about bad faith because the argument we were arguing was an argument premised solely on the idea there was no coverage. We're not arguing that if there's no coverage, you treat it as very badly and we should recover. What we're arguing is there was coverage, and in the motion papers themselves, Euler-Thrott says that the coverage issue is either moot or disputed. They never make a formal argument that this claim was never covered and we paid it anyway. We would have responded to that. That argument was not made. We were never called out to make an argument about coverage. It's a fairly convoluted issue, the coverage issue, and there's issues about estoppel and how the policy is marketed and what the people believe. You would need to go into a lot of testimony to understand. So we viewed this as they're calling us out for saying, or they're saying this claim is not covered, therefore you can't have bad faith. We simply said coverage is in dispute at this stage, therefore you can't get summary judgment. It's that simple. So we believe granting, dismissing all the tort and statutory claims at this stage with this record was inappropriate and that the passage of time did not change that. It's hard to say when during the taking of these 12 depositions we should have put more evidence in. We had to put our opposition in before any of them were taken. What about the DTPA claims? Those don't seem to depend on the contract. The argument there was that our client had too much assets to be covered by that statute and we put in evidence that they did not have sufficient assets. In other words, that they weren't good qualified as a consumer because of their amount of assets. The court never got to that issue. Now on the negligence claim, I assume what would ordinarily happen in a lawsuit would be you would sue to reform the policy to add that rider. Yes, that was one of our claims. I mean, that would be the way you get to the leaving out the rider. You would say you would sue to reform the policy to get the rider put on the policy and then, but then your remedy would be to be able to collect on the policy, wouldn't it? Once you've got the rider in, then you've got coverage and you can recover on the policy. How can you get anything additional to that? Well, Your Honor, that raises a question that has not arisen as to whether the settlement affected the reformation cause of action. That hasn't been briefed. I understand what the issue the court's raising. Okay. Thank you very much. Okay, Mr. Berman. I'm going to speak briefly on the motion for reconsideration. So all of the arguments that I presented to show that no, this was ineffective are also demonstrate reasons why we didn't present all our evidence at the time of the summary judgment motion. So we had a reasonable and good faith belief that that Euler was not calling for us to present every evidence on every essential element of every claim. We believe that the summary judgment on the issue of sustainability pertained only to waiver and only set up this Stoker claim, which we never allege. And in addition to that, the parties had discussed how to limit the summary judgment motion so that we wouldn't need discovery for it. And we postponed all the depots and a lot of the docket production. I'm trying to get the timing in mind. You they filed a motion for summary judgment. You replied. Then since then, discovery did occur. All the discovery that you originally departed did occur. Correct. So nobody was complaining about that was untimely or anything else. So you've got all this discovery. What was the point of doing the discovery? So what we had agreed on was to have an early summary judgment motion that just focused on. I got it. But you did the discovery. Now, why did you do the discovery? Well, because the district court didn't rule on the summary judgment motion. We had requested that the district court set the summary judgment motion in late January and in the hope that we would get a ruling on the release and waiver. And if the district court disagreed, then we've saved ourselves the expense. If the district court denied the summary judgment motion, then we would go to show discovery on the bad faith, misrepresentation, fraud and negligence. And our best laid plans did not work out. The district court said, I'm not going to hear this motion until discovery is over. Sorry. And so then we proceeded with all the discovery. Why didn't you amend your response at that point to include all this discovery in there? I guess I'm having a hard time seeing why you did the discovery and then didn't use it in your response. Because it was my belief that Euler was not challenging any essential element of the claims. And that was that was by design. And when they did challenge those essential elements as to certain claims in the reply, I objected. So the decision at that point was we didn't have a ruling on the objection. We didn't have any permission to submit. How can we tell to certainty from this record that the district court didn't consider that discovery? Subsequently, you filed something saying, OK, here's fact questions. Here's this and that. Not me. That was that was Euler. So Euler had submitted a supplemental declaration and I believe one other supplemental document. Each time I objected and saying, whatever the summary judgment briefing is over, there's no permission to submit this. I was trying to avoid what would be endless rounds of briefing. And by limiting my response to what the original motion said and also by asking the judge for permission to file a supplemental brief if the judge or the district court was going to consider the new evidence. You're asking the district court not to consider the new evidence? Correct. So we objected to all the new arguments that Euler made in there. But then when he ruled against you, you turned around and said, judge, we want you to consider this. Oh, no, no, no, no. We did not. I objected and said this was never raised in the moving papers and therefore it's not proper for summary judgment. And then the court disagreed and said, you can file a motion for reconsideration. And at that point, I had to submit all my evidence to show prejudice and not harmless error. How do we know that the district court, to a certain extent, the district court at that point did not consider your evidence? We don't know for sure. If the district court did consider the evidence, then the review is de novo. And I believe we established a tribal issue under the de novo standard. So it's possible he considered it. If he didn't consider it, we don't know that either. Then it's abuse of discretion. And under the circumstances of this case, we believe it was a clear abuse of discretion. We were not cavalier. We were not careless. It was a good faith, reasonable belief that the summary judgment motion was limited. And we submitted all our evidence on those points, 27-page brief, binder full of evidence. And we relied on the original motion and the notice in making a response. You know, what jumps out at me on the bad faith claim is the insurance company had a perfectly good defense on the policy that was issued. So why was it not at least reasonable enough to avoid a bad faith claim for them to rely on the policy that was issued? I mean, the insurance, you didn't move on that issue? Well, I don't know. But I mean, you might file a bad faith claim, and that's all over the case. I don't know. I don't know why some explanation doesn't have to be made about that. So we had a number of claims that don't rely on coverage. So misrepresentation, fraud, negligence, all of those are alternative claims. But all those seem to me, at the bottom, you're saying you were unreasonable or negligent or in bad faith in not paying this claim promptly. And they had a perfectly good defense based on the policy that was issued. I'm not sure if I understand. Well, the rider was not attached to the policy. Right, right. So without the rider, they had a defense, didn't they? Well, we strongly disagree with that. We believe that there was coverage under the policy even without the rider. And Euler were the only people that knew or believed that a rider was necessary to provide coverage. Now, under common law, bad faith, I agree with Your Honor that Euler could have submitted that defense. They didn't. They never argued it. And the reason is that under Texas law, it won't get them out of the Prompt Payment Act. OK, thank you very much. Still got to be covered. Under the Prompt Payment Act, yes. And bad faith. Not under the Prompt Payment Act. It's simply a delay. Bad faith. You can't have a cause of action for bad faith insurance claims unless you have coverage issued. That's correct. That's correct. And that's why we continue to assert coverage and the alternative claims based on non-coverage. Thank you, Your Honor. Thank you, Mr. Salinas. We're glad to see you here this morning. Thank you very much. It was touching up. It's a privilege to be here after mid. And let me touch upon a couple of points that were raised here first. On the DPTA claim, as a matter of law, the DPTA claim is unsustainable here, no matter what standard, as expressed in the Kosurik versus Kuna mutual case, which squarely holds and cites Texas Supreme Court authorities that a beneficiary of an insurance policy is not a consumer under the Deceptive Trade Practices Act. That was a similar fact, was it? Well, that was a case involving a husband and wife in which the husband was a beneficiary of an insurance policy. And the court squarely held that a beneficiary is not the consumer. Here we have a business transaction where arguably the lender was a third-party intended beneficiary of this policy. And there were direct representations made, were there not, on the website to this lender that this transaction-by-transaction is covered. No, talk about the website. The website pertains to generic descriptions of what a credit insurance policy does. It doesn't speak to any specific lender. We accept- I thought this lender was told you could go on our website and buyer-by-buyer see what's covered under this policy, so that you know before you lend money transaction-by-transaction whether you've got insurance. No, that's not- what happens is that there is a- we accept, by the way, that a lender is a third-party beneficiary of the contract. Under the terms of the beneficiary endorsement, it receives the same rights, but no rights greater than the insured. And it also can file claims. And in fact, if a claim is paid, you have to get a release from the payee. In that capacity, it's a lost payee. Now, to your point, there's a system that is available to an insured and to anyone else who wants to access it called EOLIS, E-O-I-L-I-S. And it's basically an online access to see what buyers of the insured have what amounts of coverage. So- And you- so your website said they were covered, and later you said no, they're not covered. No, no. Look, what is a- to be eligible for coverage means you're a buyer, you're a credit-approved buyer. So in this case, you had Mosmax, Grimatex, Intermoda, and one other one that were people out there. They were Mexican companies that were buying goods from Tramago and other people on credit. They're approved as a buyer under the policy. The policy defines how that happens. That's simply a status of somebody. We're going to- now, under the policy, it doesn't mean any transactions that you might possibly make to any of these buyers is covered under the policy. It simply says, we're looking at these people. If you file a claim for a lost payment on an account receivable, then you have to go to the policy itself and determine whether that falls within the coverage agreement of the policy, the coverage grant of the policy. And that's the coverage grant according to Tramago, not to the beneficiary. The beneficiary is simply a secured party that happens to have a security interest in accounts receivable and is looking for credit support on top of its security interest. So the coverage cannot- beneficiary doesn't have any independent say in whether there is coverage or not. It's submitted as a claim. The claims person evaluates it and checks to see whether it fits within the coverage grant of the policy. It's not exclusion or anything. It's the burden of Tramago, the insured, to establish that. As it turns out, and of course, the beneficiary can watch. But all they can do is watch. And they can go on the website and look at how much coverage might be available to say Intermotive, say $100,000 or $200,000, and it changes. The policy reserves the right to move it up and down for any reason as long as it's done prospectively. And you don't want to ship to somebody where you don't have coverage or you have to make your own decision. So the beneficiary- saying the beneficiary can see what's available in terms of coverage, can evaluate- make the same evaluation as anybody else can. Then the claim is submitted. As it turns out, these particular claims do not fit within the coverage grant of the policy. Everybody is notified. And there's a declination issue- four declinations here. And there were a variety of reasons. The most significant of which was that there were- these goods originated from a third party source, which didn't emanate from the physical custody and control of the insured, hence no coverage. And notification was made. And the person looking at the policy reads that and doesn't see their coverage and so on. The beneficiary can attack the claim if it wishes to do so. It can file its own claim on the very same account receiver if it wishes to do so. In this case, it didn't. Everybody got notification the claims were not covered. Tramago, the insured, and Continentals borrow earls, went and pursued the claim. It lobbied to get it paid. Didn't work. It brought a lawsuit. It sued us. And this was part of a huge war that happened. Tramago ended up suing Continental, its lender. Its lender sued it. The broker is being sued. Roberts and Crow is Tramago's broker, who was involved in the handling of all of this, is being sued for failure to procure the right policy, including the third party beneficiary. There's a war going on. At the end of the Tramago, the insured insurer claim is resolved by a settlement. Tramago sued for fraud and all these other kind of things against Euler. Tramago's claims were settled, paid, and every single one of its claims was dismissed with prejudice. Not just, there was no carve out, no nothing. The beneficiary can have no greater rights than the insured has. There was no assignment of anything by Tramago to Continental. Let's carve out one of these fraud claims, one of these DPTA claims, one of these prompt payment claims, et cetera, and give it over, and they can have that claim. That didn't happen. When the claim was getting ready to pay the claim, we have to respect one other provision in the policy that was reserved in the settlement of the claim, is we have to get a release from Continental. We can't just go pay Tramago. So we honored that. We went to Continental. Continental said, no, we have a fight going on. We want all the money. And Tramago said, no, we're done with you. We already resolved. We already settled with you. It got a little complicated. But at the end of the day, Tramago fully and completely released with prejudice every single claim and all that. Now what Continental would like to do, having gotten the full benefit of the policy, the contractual rights in the policy, which is the only source of standing that it has, now wants to tortify the case and come up with vague theories of some kind of overarching liability. And we were scratching our heads. We've been through a war. We've been through four wars, really. And what's really left on the battlefield of this war? I mean, it was baffling. What do you really want from us? One of the claims that was featured prominently is prompt payment. They want 18% on top of a $2 million plus attorney's fees. Well, the Higginbotham case and even the Cater case and the Prompt Payment Act seem to take care of that as a matter of law. Those require liability. This was a settlement, unlike the Higginbotham case, where there was an adjudication of liability. $30,000 for that Porsche 911 was an obligation that the insurance company had to pay, didn't pay, got sued, lost to a jury, and reserved specifically the prompt payment claims. You know, at the end of the day, there was liability. And hence, in Higginbotham, 18% of all that had to apply as this court held. Similarly, in the Cater case, there was actually a settlement. But that settlement provided that the insurance company, it was USAA, had to pay contract damages in the settlement. We were liable for contract damage by way of a settlement. Not like we did. We settled in the usual way. They did it a different way. And hence, they, as a result of that, they ultimately, after some tortured history, had to pay the 18% because there was contract damages for which they were liable. There's never been a case, not any that ever, where a settlement, pure and simple, somehow entitles one of the beneficiaries of the settlement to come in and say, oh, wait a minute, we want 18% attorney's fees for the case we just settled. Not only has it never happened, it can happen and it shouldn't happen because what would be the point? You'd never be, every single case that's settled, you have to litigate over whether, well, we can go back to the same issues that underlie the settlement and we can litigate whether there was a breach of contract and we can litigate that by proxy and find out what if there had been a breach. No one would ever settle a case. It wouldn't make any sense at all. So the problem here is that Continental is very ambitious in wanting to squeeze every conceivable type of claim out of this. Fraud. Let's go back. Let's just mention fraud for a moment. In the sequence of events, originally there was a policy. Tramago and Euler had a policy. That was formed in September of 2007. Insurance policy was delivered, accepted, the broker was involved, placed it, described in the application Tramago as a distributor, enlisted a whole bunch of customers. And the policy was accepted and there was already a third party, another beneficiary, another financier called TransCap. Six months later, TransCap is replaced with a new factor, a secure asset-based lender, Continental. Continental, Tramago and Continental jointly sign off, we want to add Continental, we want to add Tramago, we want to add Continental, we want to add Tramago, we want to add Tramago. And now they've joined into the existing policy. Now where's an opportunity for fraud against Continental here? The policy's been around for six months. There was no dealings whatsoever between Euler and Continental. Continental didn't even exist in the picture. All of a sudden, Continental and Tramago, through the broker, come in and say we want what Tramago has, already has, not doing a rewriting, we want something different, whatever. And then the policy a year later, six months later to be fair, is renewed again. September 1st, 2008, same deal. Are there any renewal applications, any changes to the underlying business? Both sides sign off, they get the policy, they look at it, they circulate it, they accept it, then they pay the premiums made by Tramago. Continental pays no premium. And there we go. Claims get filed, and where is even an opportunity for somebody to defraud someone else? The only statement, the only representation that exists in the entire universe here is the policy itself. But if there's no coverage under the policy, that's not fraud, that's disappointment that somebody, a particular claim didn't fall within bounds. But where do you get an attempt to defraud? Where do you get all the elements of a fraud claim? Where's the misrepresentation? Where's reasonable reliance? You've got a policy and it doesn't, this is again an attempt to tortify somebody. It doesn't, in the real world, doesn't even make any sense. Yes, you can say it, you can say fraud. Negligence, where's the, negligence, where's the duty? Negligence requires a duty. Where does that duty arise from, to Continental, which doesn't even exist when the policy is formed? It's hypothetical duty to some, you know, beneficiary who just says, I want what Tramago has by way of an application. Judge Hinojosa was scratching his head just as much as we were. What is, where's the beef here? And didn't get it. So we still don't know, if you go all the way fast forward and read the last, every last page of the reconsideration motion, we still scratch our head over what, where, where is the, where is the basis for liability? The case should be over. There's been four cases, five years, and you think that Judge Hinojosa got it right, then it should be affirmed. Thank you. Okay, thank you, sir. Okay, Mr. Pierce, back to you, sir. Thank you, Your Honor. I want to return briefly to the issue about the release of the contract claims. It's a release. That means it's to be interpreted narrowly. It's not a general release. It's not broadly written. It's a release. Under Texas law, the Victoria Bank and Trust case cited in our brief, a release must mention the claim to be released by name in order to release that claim. Here, not only was the Prop Payment Act claim and all of the other claims not mentioned by name, there was a curve out for statutory claims. And the Texas Prop Payment Act claim is a statutory claim. I don't know how it could be interpreted any other way that it wasn't released. The argument made is that by implication of the release, one of the premises for it is liability under the policy. Well, that makes this case no different from the Cater case. In the Cater case, there was a settlement, just like there was here. The amount of the claim was paid, just like there was here. And then it goes to the court, and the court denies the cover in the Prop Payment Act. And the Texas State Court, following Higginbotham, but different facts closer to ours in Cater, says, no, you are entitled to that 18%. After all, the two years did go by, and the claim was not paid. We're entitled to show that it should have been paid. We did not give up the right to show that it should have been paid. Neither side gave up any rights in regard to that. Now, I want to emphasize again that the statutory claims are not an add-on in the prayer. They're not just something that's tagged on in the end. They're separate claims in both of our operative complaints. And again, this argument about this will deter settlement. Well, this case could have been settled differently. It could have been settled with, we're settling everything, everything's going away. We would have asked for more money if that had been the case. We took out the principal amount of the claim. That's what we got, and we had to split it up with Tramago. So when Mr. Salidas says that, well, in the Cater case, they paid contract damages, well, what's the settlement here? It's $2 million, the amount due under the contract. We release the contract. It's clearly contract damages. It's not even a discounted amount. It's the full amount. So to say that our statutory claims went away under that circumstance, I think goes against all the law of release. With regard to Judge Owen's point about the website, yes, they are representing, Tramago can ship to these parties, and we will provide insurance. At that point, my client authorizes the funds to be loaned to Tramago. So they're taking a risk every time they see that on that website page. We're now hearing that, well, there was an exclusion all along. It's not actually an exclusion. There's no exclusion in the policy for shipments from third parties. There's a definition, and even on that one, Mr. Salidas got it wrong. What it says is, there's dispatch when it leaves your control, not physical control, just control. We would argue, of course, that if Tramago has a warehouse and a contractual arrangement with those people, it's under their control sufficiently that it's insured, certainly sufficiently for Euler, which knew about this and whose agent knew about this and knew that they were third-party shipments, to charge them a premium for many years for this policy. Euler is a wrongdoer here. They did not pay a valid claim for two years. At great loss to my client, whose own lender became very concerned, and they issued a policy that they knew did not provide coverage for the business model of the party that my client was insured was lending to. And so for them to stand here and say, we don't understand how there can be tort liability when they sell a policy that they know does not cover somebody's business and does not pay a claim for two years and then pays it in full, I think defies belief. We are entitled to our day in court on that. All right. Thank you, gentlemen. We have your case.